### MASON v. UNITED PRESS OF ILLINOIS.

(Supreme Court, Appellate Division, First Department.   May 6, 1904.)

1. CONTRACT—TERMINATION—NOTICE—SUFFICIENCY.

A contract providing that it shall be terminated only by written notice may be terminated by verbal notice when the obligor and obligee are corporations under one management, and a resolution is passed by one of the corporations directing its secretary to terminate the contract, since he is charged with knowledge, as secretary of the other corporation, that the notice has been received.

2. SAME—ACQUIESCENCE IN VERBAL NOTICE—CURE OF INFORMALITY.

Where knowledge of the giving of a verbal notice of the cancellation of a contract providing that it may be terminated only by written notice is brought home to the president and vice president of the party receiving the notice,  who, together with the general manager of the company, acquiesce therein, any informality in the giving of the notice is cured.

Appeal from judgment on.report of referee.

Action by Frederick G. Mason, as assignee for the benefit of creditors of the United Press of New York against the United Press of Illinois.   From a judgment for defendant, plaintiff appeals.   Affirmed.

The contract referred to in the referee's report is as follows:

"This indenture made this nineteenth day of September, A. D. 1887, by and between The United Press, a corporation organized under the laws of the State of Illinois, party of the first part, and The United Press, a corporation organized under the laws of the State of New York, party of the second part, witnesseth:  that

"Whereas, said party of the first part. has the power to build, operate and lease telegraph and telephone lines and other means of transmitting news, and to invest in the stock and securities of other companies, and

"Whereas, said party of the first part intends and expects to acquire telegraph property through which it will be enabled to extend, solidify and render more permanent and valuable the news service of said party of the second part, and

"Whereas, said party of the second part requires the use of wires not now obtainable at rates which will enable it to operate its business without loss, and desires to place its business upon lines which cannot be sold or leased to its disadvantage, and

"Whereas, the business of said party of the second part is now on a paying basis, but contingencies are foreseen and impending wherein its present resources may be wholly inadequate for the protection of its existing interest,

"Now therefore, in consideration of the premises and of the covenants and agreements herein contained, and in further consideration of One Dollar in hand paid by said party of the first part to said party of the second part, the receipt of which is hereby acknowledged,

"Said party of the first part hereby covenants and agrees to make all due and practicable endeavors to strengthen the position and improve the news

service of said party of the second part by supplying it with wires in territory where additional telegraphic facilities are required, which are not now obtainable by it at remunerative rates; and further covenants and agrees to guarantee, and does hereby guarantee to said party of the second part during the term of this agreement the payment of the expense of operating its business, including its taxes to the City of New York; and, in addition thereto, an annual dividend of One Dollar and Fifty Cents upon each share of the capital stock of said party of the second part; the first dividend being payable on or before the second Monday of January, 1888, and succeeding dividends annually thereafter during the continuance of this agreement.

"Said party of the second part, for the consideration hereinbefore expressed, hereby covenants and agrees to pay in monthly instalments to said party of the first part, all the net income that accrues from its business, if any such there be.

"It is further mutually covenanted and agreed by the parties hereto that said party of the second part shall retain and keep intact, as a working capital, the sum of $10,040.67, now in its treasury, which has been derived from the sale of franchises, and shall continue to conduct its business, to collect its revenues and pay its expenses, as has been its practice heretofore.

"It is further mutually covenanted and agreed that this agreement shall take effect October first, 1887, and shall continue in force for the period of one year, and thereafter until terminated by thirty days' notice in writing by either of the parties hereto.

"In witness whereof, the parties hereto have caused these presents to be executed by their proper officers, and have caused their respective corporate seals to be hereunto affixed the day and year first above written.

"The United Press (of Illinois),
"By J. R. Walsh, President.
"Azel F. Hatch, Secretary.
"The United Press (of New York),
"By Walter P. Phillips, Secretary.

"[Seal of United Press of Illinois.]
"[Seal of United Press of New York.]"

The following is the opinion of referee McKim:

The plaintiff sues as assignee of the United Press of New York to recover the amount of expense incurred by that corporation in the operation of its business from January 1, 1896, to March 19, 1897, the date of the general assignment, and, among other grounds of defense, the defendant asserts the termination of the contract upon which the action is founded, through the agreement of the parties in or about the month of June, 1895. It appears that the business of the New York company was conducted at a substantial profit from the year 1887 (the period when the contract in suit was made) until the year 1893. In 1893 the internal management of this company was taken in charge by the defendant, through its executive committee, succeeded by its ways and means committee in 1895, and the directors of the New York company held no meetings, even as a matter of form, after April 23, 1894, except to make the assignment to the plaintiff in 1897. Thus, from April, 1894, at least, the New York company preserved its individuality more as a matter of legal theory than of substantial fact. It had a plant and an established business, but these were controlled wholly by the defendant corporation, which in turn possessed certain additional charter privileges and an active board of management, with nothing of its own to manage. Practically, the result was to make of these two corporations a single useful entity through mutual dependence. The New York company was the body, the Illinois the head; but the contract in suit certainly did not suggest this form of development, nor could it, probably, have remained enforceable had it done so, and it becomes interesting to look for the origin of this state of affairs. In 1892, when the business conducted by the New York company had commenced to foreshadow an excess of expenses over income, the Illinois company (the defendant) owned the great majority of the former's capital stock, and an explanation of the defendant's assumption of control is indicated by the proceedings at a meeting of the stockholders of the New York company in that year, in the course of which meeting a proposal by the Illinois com-

pany to purchase the plant of the New York company was accepted, and a committee given power to attend to the winding up of the business. The business, it appears, was not ·wound up, since there is no report on the subject, and Mr. Mason is not contradicted in his testimony that the New York company continued its business to the time of the assignment. We have the fact, however, that the Illinois company shortly afterward took control of the management, and with the apparent acquiescence of the stockholders, who had agreed to a sale of the plant, and seemingly assented to a complete dominion by the defendant. Presumably there was no sale, for the New York company seems to have retained possession of its plant, but, through the actual domination by the Illinois company, there resulted none the less a change in the relations of these corporations not in harmony with the contract of 1897. The contract looked to the separate character of the corporations, and contemplated, in its terms, the continuance of the conduct of the business of the New York company "as has been its practice heretofore," a condition quite at variance with the management of that business by the Illinois company. The control of the business of the New York company upon the part of the defendant was actively exercised through Mr. Walter P. Phillips, its secretary and general manager, who also held the office of secretary and general manager of the New York company. Mr. Mason, the plaintiff, performed the duties of auditor of the New York company from March, 1893, to the time of the assignment in 1897, and also acted as assistant secretary of the defendant from May, 1895, until some time after the assignment. The claim of the plaintiff, under the contract of 1887, is based upon figures appearing in the books of the New York company as representing the expenses incurred from January 1, 1896, to March 19, 1897, and also upon entries made by Mr. Mason upon the books of the defendant which purport to show the existence of the liability which is here asserted. There is no question, as I have said, that the New York company continued to do business during this period, but the question is whether that business was being done under the contract of 1887 or not, and upon consideration of the evidence before me I am compelled to the view that the contract had been actually abandoned in the year 1893, and, in legal effect, terminated by agreement of these two corporations in 1895. In view of the identity of management it is not to be expected that an actual intention to alter contractual relations between these companies would be evidenced with the same degree of particularity as in the case of dealings between individuals. Evidently what was deemed best for the joint corporate endeavor, in the minds of the dominant committee, was to be viewed practically as the sense of both corporations, for this could be the only result of the abandonment by the New York company to the Illinois company of its control of its own business. Now, there is no room for doubt as to what this committee's attitude was in relation to the contract of 1887. The question came up at a meeting in June, 1895, and a resolution was adopted whereby the secretary of the Illinois company was directed to give notice of termination of the contract to the New York company. To terminate the contract according to its terms, written notice was required, but this written notice would properly have been given to the secretary of the New York company. Mr. Phillips was secretary of both companies, and when charged with the duty of giving the notice he was also charged with knowledge that it had been received. Furthermore, knowledge of what was done in the matter of the resolution and of Mr. Phillips' receipt of this form of notice was brought home to the president and vice president of the New York company, and their acquiescence, together with the approval of the general manager of the New York company (again Mr. Phillips), would serve to cure any informality in the giving of verbal rather than written notice. The question is one of substantial intention, and while, in a conceivable case, the surrounding circumstances might serve to make strict compliance with such an agreement as to the form of notice essential, here the surrounding circumstances so clearly disclose the intention to accept a termination that to give force to the provision for written notice would be to employ a worthless technicality against the justice of the case.

This agreement of 1887 was of value to the corporate enterprise only so long as there was a profitable business to conduct. Had these corporations been dealing at arm's length, the defendant would certainly have terminated the relations existing under the contract the moment the unprofitable char-

acter of the venture became apparent. Common sense forbids any other con-
clusion. When the business became a losing one, in 1893, immediate steps
were taken by the defendant to change those relations. It offered to buy out
the New York company, and the offer was accepted, but, instead of a con-
cluded purchase by the defendant, there followed an abandonment by the
New York company to the defendant of its individuality in the management
of its business. When we consider that the organization of the defendant
was originally projected to enable the United Press of New York to get the
benefit through this contract of broader charter privileges in the power to
control telegraph lines, the character of the joint corporate enterprise, as
thus developed, harmonizes with the intention, chargeable to both companies,
that the defendant's control was to be for the common good in a single enter-
prise. Funds were needed for the business, and in 1894 we find that four
leading newspapers of this city pledged themselves to contribute annually
$50,000 each in return for the benefit of the news service which the defendant
could offer. Thereafter the business was financed through these contribu-
tions, until the contributions failed, and the New York company confessed its
insolvency.

Looking to the probabilities, it is clear that the Illinois company did not
proceed under the 1887 contract after this so-called "four-party" agreement
of contribution came into operation. However it may have become possessed
of the control of the New York company's plant and business, there is no
doubt that it had the means of obtaining the benefit of that plant and busi-
ness through its ownership of nearly all the New York company's stock, and
thus the existence of the 1887 contract was not important to the enterprise
in 1894. To say that the contract did subsist notwithstanding the change in
the relations of the parties, would be to infer an intention upon the part of
the defendant to turn over the amount of the indebtedness of the New York
company as a gift to the minority stockholders or to its creditors, without
any possibility of countervailing benefit to itself. Such an undertaking
would not be for the common good under this identical scheme of manage-
ment, and the inference is irresistible that the New York company had no
understanding that the contract did subsist in fact, while the direct proof is
unmistakable that the defendant treated the new relations of the parties
under the operation of the four-party agreement as abrogating the old con-
tract. The actual understanding of the New York company, so far as it re-
tained its identity, is inferable also from the fact that after 1894 no mention
of the defendant's liability is found in the reports made as to its finances,
nor is any suggestion of the continuance of such a liability found to have
been made in the form of demands upon the defendant.

Mr. Phillips and Mr. Mason appear to have been in sole charge of the ad-
ministrative details of the business as actually conducted after January 1,
1896, and, as a practical matter, the sole mind affected with the thought that
the agreement of 1887 remained in operation was Mr. Mason's. He was
unaware of its abandonment or termination, but his position in these cor-
porations, while important as to matters of business detail, was not so close
to the executive control of the corporations as to render his personal state
of mind the test of the corporate intent. His duties were performed under
the direction of Mr. Phillips, who, as secretary and general manager of both
corporations, was familiar with the facts touching the actual intent of the
interests represented in the corporate enterprise, and whose personal view
of the existence of the 1887 agreement was directly contrary to Mr. Mason's.
Under the circumstances, such entries as Mr. Mason made in the books of
the defendant tending to charge the latter with this liability, have no great
probative value. That they represented the defendant's admission of a fact
is wholly opposed to the probabilities of the case, and to the direct evidence
of what the defendant, through the resolution of its board of directors, de-
clared to be its actual intent, and the conclusion is not readily to be resisted
that the making of these entries was due to a misconception of fact by Mr.
Mason, as a result of which he exceeded his authority.

There is evidence that Mr. Mason, as auditor of the New York company,
addressed a communication to Mr. Phillips, as secretary of the defendant,
shortly before the time of the general assignment, wherein he indicated the
presence of the claim in suit; but this would have no particular value, for
the reasons above stated, except as showing acquiescence by the defendant

in the claim when apprised of it. The proof, however, falls very short of establishing Mr. Phillips' receipt of this letter. Secondary evidence of its contents was received upon Mr. Mason's testimony that he delivered it, but at a later stage of the trial he testified that he did not deliver it in person, nor did he mail it, and we have only his assumption that it was received.

As I have pointed out, the probabilities are all with the defense of abandonment of this early contract, and the New York company, by its voluntary relinquishment of control of its affairs to the defendant, placed itself in a position to be bound by the abandonment of the 1887 contract through acquiescence in the action and understanding of the common secretary and general manager agreeably to the sense of the common committee of control.

My conclusion is that the contract in suit was terminated through the acceptance of verbal notice of termination by the plaintiff's assignor in the year 1895, and there should, accordingly, be judgment for the defendant for the dismissal of the complaint upon the merits.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, PATTERSON, O'BRIEN, INGRAHAM, and LAUGHLIN, JJ.

A. W. Otis, for appellant.
S. Bacon, for respondent.

PER CURIAM. Judgment affirmed, with costs, on the opinion of the referee.